1799 from the Western District of Arkansas, Northport Health Svcs of Arkansas et al. v. U.S. Department of Health and Human Svcs et al. All right, Ms. Murphy. Thank you, Your Honor. Good morning, and may it please the Court, Erin Murphy, on behalf of the plaintiff's appellants. In 2019, CMS enacted a rule that special disfavored treatment. The rule prohibits long-term care facilities that participate in Medicare or Medicaid from requiring new residents to agree to arbitrate any future disputes, and it requires such facilities to provide special explanations, agree to special revocation terms, and secure special assent when offering residents the option to arbitrate. If a state were to impose comparable conditions on the use of arbitration agreements, that effort unquestionably would be preempted by the Federal Arbitration Act. Indeed, both the Supreme Court and multiple courts of appeals have squarely held that state laws designed to impede or discourage efforts to enter into arbitration agreements are just as preempted as state laws that prohibit or constrain their enforcement. Now, here, of course, the arbitration disfavoring rule comes from a federal agency as a condition on the receipt of federal funds rather than from a state as a rule of general applicability, but that doesn't alter the bottom line, for the Supreme Court has also made emphatically clear, most recently in EPIC systems, that federal agencies may not enact rules that conflict with the FAA's strong pro-arbitration policy unless Congress clearly and manifestly empowers them to do so. Congress has done that for some federal agencies, but CMS is not one of them. Indeed, I don't understand CMS to argue otherwise. The arbitration rule is, therefore, both in conflict with the FAA and in excess of CMS's statutory authority. If I could start by talking a bit about the preemptive scope of the FAA. The FAA imposes what the Supreme Court has often described as essentially an equal treatment or an equal footing rule. Arbitration agreements have to be treated like any other type of contractual provision. Parties can enter into them on the same terms, and they'll be enforced on the same terms. Whether a state is trying to say we won't enforce certain types of agreements, or it's trying to say we're going to make it harder for you to enter into arbitration agreements, those efforts are going to be preempted by the FAA. I think a good illustration of that is the Doctors Associates case from about 20 years ago, where the Supreme Court long ago made clear that you can't have rules that make it harder to enter into agreements. There, a state had a law that said it's perfectly fine to arbitrate, to have arbitration agreements, but if you want to have an agreement, it has to be on the first page of a contract and underlined and in all capital letters. The Montana Supreme Court upheld that provision by saying, look, we're not interfering with the right to arbitrate. All the state is doing is ensuring that arbitration agreements are voluntarily entered into. The Supreme Court- This is Judge Smith. Have there been any rules allowed to restrict the creation of an arbitration agreement where the arbitration agreement is, in essence, an adhesion clause where there's no opportunity for individuals to bargain? It's simply built in. Sure. Those two, if they single out arbitration agreements alone for saying you can't have a contract, an arbitration agreement of adhesion, that is squarely preempted. That was the kind of rule that the First Circuit addressed in the Connolly case that we discussed in our briefing. It was that case I think is actually quite on point with what CMS is trying to do here. That was a state agency that had said, we're not going to prohibit arbitration agreements, but we're going to say that a licensed securities brokerage firm can't require parties to enter into them as a condition of contracting. If a firm does so, we can penalize them for using a contract of adhesion. What they tried to do in defending that rule is say, look, all we're doing is having conditions on entering into agreements. We're not even saying that the agreements aren't enforceable in court. We're just saying we can penalize the brokerage firm if the brokerage firm violates that rule. And the First Circuit squarely rejected that argument and said, look, it's just completely contradictory to that equal treatment rule that the FAA establishes because it's singling out arbitration agreements and saying we're going to require something different and special to ensure that an arbitration agreement is voluntary than we require to ensure that any other contractual provision is voluntary. So the basic thrust of the FAA is, of course, agreements have to be voluntary, but the way we determine whether they are is by applying ordinary contract law principles, doctrines like duress and unconscionability. We don't single out arbitration agreements and essentially presume that they are involuntary unless parties use special procedures, highlight them in a special manner, explain them in a manner, get some sort of additional assent from the party that's agreeing to arbitrate. Now, that's exactly what this rule does. By its terms, it is an arbitration-only rule. It doesn't apply to any other provision in an admission agreement for a long-term care facility. It just says if you want to have arbitration agreements, you can't make them a condition of accepting a resident. You have to explain them in a particular manner. You have to secure consent beyond the revocation period. So this is just a class rule that is on its face, singling out arbitration agreement for special disfavored treatment. Okay, so how does this work under the statute? As I read it, it deals with validity, irrevocability, and enforceability. So in this particular situation, we're not talking about the enforceability or the validity of the contract. We're not talking about the arbitration. So if the arbitration agreement was entered, that's valid, right? They can go ahead and arbitrate. So I'm curious, what exact language of the statute are you focusing on for these particular contracts? So I think all of these terms have been interpreted by the Supreme Court in a manner that's broader than dealing with specifically enforceability. And the Kindred Nursing case is very on point for this because there the argument was made. That was a case where the rule was, you can have an arbitration agreement, but someone with power of attorney can't enter into it for you. And the argument that was made to try to defend that rule was, this rule is not about the enforceability of an arbitration agreement. You can still have arbitration agreements. It's just about what it takes to form them. And the Supreme Court, looking at the language of the statute and looking more broadly at the way the statute's been interpreted for decades, said that the statute is not concerned merely with enforcement of agreements. It's also concerned with what it takes to enter into them. And what the court said is, any other rule would make it trivially easy for courts to, for states and here federal agencies, to evade the commands of the FAA. Because all you would have to do is say, we're going to impose massive penalties if you enter arbitration or impose special taxes on the arbitration awards or use all sorts of disincentives to essentially prevent parties from ever having arbitration agreements in the first place. And I would note, you know, that fact pattern of an agreement still being enforceable is exactly what the First Circuit confronted in that Connell case. What was said in defense of that state rule was that the brokerage firms that enter into these agreements, they can still enforce the agreements. No one's saying they can't enforce the agreement. All the state was saying is, we can impose a penalty on you. We could maybe take away your license to be a brokerage firm, but you can still arbitrate. And the First Circuit said, if anything, that's worse than just not enforcing a particular arbitration agreement because you're basically saying we'll threaten your entire livelihood if you use arbitration in a manner that's inconsistent with these special rules that the state has signaled it out and imposed upon arbitration. So, you know, again- Ms. Murphy? Yes. This is Judge Smith. Does the record include any kind of data or research indicating what the impact of this rule would be on the availability of long-term care, on the potential for the reduction of available facilities? Is anything like that in the record? Yes. So, you know, so there's two records here, Your Honor. There's the administrative record itself that the agency relied upon in imposing the rule. And then there's a record in a sense that we've created throughout this litigation, particularly in the context of because we've been seeking injunctive relief and sought and received a stay from this court. In the context of the administrative proceeding, many of the commenters who opposed the agency's rule here explained that this would have real costs, both for facilities and residents, because realistically, once you have a rule like this, especially a provision that says you can't require arbitration as a condition of contracting in the first place, practically, you're going to have very few and studies have shown that once a dispute arises and people are in the posture of litigation, they're much less likely at the time that kind of post-dispute period to agree to arbitrate. So realistically, you're going to have essentially very little arbitration. And that, in turn, is going to increase litigation costs for facilities and is also going to increase insurance costs for facilities because insurance policies are more expensive for a facility that is subject more to risk of litigation than to risk of arbitration, because arbitration is by design cheaper, faster, more efficient, things that insurance insurers like. So all of that was put before the agency in explaining why this rule was not something, just some minimal technicality, but would have real costs. And in addition, it would have the problem, the specific problem in the context of Medicare and Medicaid, that the facilities can't address those costs by raising their fees because fees are controlled by Medicare and Medicaid. So they're going to have to find other ways to pass on the inevitable costs of more litigation. So all of that is a real problem with the rule. And the suggestion by CMS that facilities should just, if they want to use arbitration, just stop participating in Medicare or Medicaid at all, just makes matters worse, because a rule that essentially would lead to there being fewer facilities able to serve this population seems quite counter to CMS's mission. But as a practical matter, I think the agency knows that's just not going to happen because we're dealing in an area where the patient population that these facilities serve is predominantly eligible for Medicare and Medicaid. So facilities don't have the option to say, we'll just stop participating in those programs. I mean, the affidavits we put in the record here from the lead plaintiffs in this case demonstrated that 70% of their funding comes from patients whose care is paid for by Medicare and Medicaid. The one other thing I think it's important to keep sight of in the government's argument that don't worry, you'll still be able to enforce the agreements, whatever sort of the technical legalities of that argument, as a practical matter, it's simply not true. If there were an agreement, an arbitration agreement entered into that was in violation of this rule, the resident would inform CMS and CMS would cite the facility for a violation. It would impose a plan of correction. And what it would require in the plan of correction is that the facility agreed not to enforce the arbitration agreement. So as a practical matter, these are not going to be enforceable arbitration agreements if they were entered into in violation of this rule. So I think at the end of the day, I come back to the basic point that this is just a rule that by its terms is doing exactly what the Federal Arbitration Act prohibits. It's singling out arbitration for special treatment. And once the rule is within the scope of the FAA, the analysis is very easy because EPIC system tells you that you need a clear and manifest statement from Congress to override the FAA. And I, again, I can certainly ask the government, but I don't understand the government to be arguing that it even could satisfy that clear statement rule, nor could I envision any such argument because there just isn't anything in the Medicare or Medicaid statutes that says anything about the ability to restrict arbitration. And I think that's particularly telling because you can compare those statutes to statutes like the Consumer Financial Protection Act or the SEC. Both of those agencies have explicit statutory authority to prohibit, restrict, or impose conditions on the use of arbitration agreements in certain circumstances. Council, this is Judge Smith again. Would you compare and contrast this case and the CAPS case and how that operated in that case, the arbitration? Yes. The D.C. District Court case? Yes. Yes. So I guess I'd say two things about it. One is we very much disagree with the reasoning in that opinion. I think there are aspects of it that are just inconsistent with what the Supreme Court has said about the scope of the Arbitration Act. If you look again at cases like kindred nursing, look at cases like Concepcion and Preston v. Ferrer, which are cases where we weren't dealing with invalidating arbitration agreements, but rather the court was interpreting the FAA broadly as encompassing obstacle preemption, as encompassing a principle of you can't have agreements, you can't have rules that interfere with agreements. So we disagree with the reasoning of the decision. That said, I do think the context there is at least theoretically a little bit different because basically the government was sort of acting in, it was closer to a market participant role. And when the government itself is not acting in a regulatory capacity, but kind of directly contracting with a party, the government is of course free to agree whether it wants to or not. So whether we know the government, the government's never claimed that CMS is acting in a market participant capacity, nor could it, because this rule sweeps more broadly. It applies not just when a facility is contracting with a resident whose care is paid for by Medicare and Medicaid. It applies to all relations between a facility and a resident. So even if a facility has residents who are paying for their own care, when then Medicaid and Medicare have nothing to do with it, it still has to comply with this rule in order to remain eligible to participate in Medicare and Medicaid. That to me is a clear exercise of regulatory authority in a way that, you know, to the extent this court feels the need to distinguish the CAPS case is a way that the court could distinguish it. But ultimately we also think the CAPS case is mistaken. Could you address your that it is an important question is whether the HHS has gone beyond its general rule-making authority and entered into an area that's unrelated to patient care. So could you address that? Yeah, and I think there's two components of it, you know. I mean, I certainly think the clear statement rule for arbitration itself informs that ultra-virus analysis, because you know, even if you didn't think the FAA just squarely was creating a conflict here, the fact that there's a strong federal policy ought to interpret, ought to inform how you interpret a general grant of authority that deals with health, welfare, and patient safety like what is being invoked here. And traditionally that's authority that's been invoked by the agency to deal with things that quite directly deal with patient health, safety, and welfare. Things like the kind of treatment that's provided, the way that facilities can, you know, make decisions about the care and things that will be available to residents. It's not used to step out and regulate the contractual relationships between parties. And I do think here, if you accept the agency's theory of the scope of its power, it would essentially require the court to conclude that the agency has basically unlimited power to compel facilities to accept residents under any terms the agency dictates. Congress has not done that in any context when it comes to participants in Medicare and Medicaid. There is a condition if you're dealing with emergency care, you know, emergency rooms have to compel comers, but Congress has quite clearly not extended that rule beyond emergency care facilities. So Congress knows how to say that agencies have the ability to basically require a facility to accept patients on terms dictated by a federal agency, and it hasn't done that here. So we think there's an ultra-virus problem even apart from the FAA problem, but here I do think that analysis is informed by the FAA and that clear statement rule that says if you want to get into the business of trying to deter parties from entering into arbitration agreements or controlling the manner in which they do so, you need clear express authority from Congress for that. If I may, I'd like to reserve the remainder of my time for rebuttal. Yes, you may. Thank you, Ms. Murphy. Mr. Phan? Good morning. May it please the court, Dennis Phan on behalf of the United States. I just wanted to pick up on one question that Judge Kelly asked about the text of the Federal Arbitration Act, and that is that the FAA's Section 2 only concerns the validity, irrevocability, and enforceability of arbitration agreements. And in fact, the Supreme Court's principle that you need equal treatment or that you cannot single out arbitration agreements also only has to do with the validity, irrevocability, or enforceability of arbitration agreements. I want to be very clear that what plaintiffs are asking for in this case is an extension of the Federal Arbitration Act in a way that the Supreme Court has never endorsed, which is to invalidate another federal authority based on the Federal Arbitration Act. That is something where the Supreme Court has said in Waffle House, for example, that the pro-arbitration goals of the Federal Arbitration Act do not require another federal agency to relinquish its statutory authority. And then there's no sense in which this case, in which this HHS rule requires nursing homes to have their arbitration agreements invalidated, unenforced, or revoked. Nursing homes in this context, following the 2019 regulation, they can enter into arbitration agreements. They can have ask their patients to enter into arbitration agreements. And they can have their Medicare and Medicaid funding too, along with it. They can have both of those things. The only thing that a nursing home, or the only two things that a nursing home cannot do under the 2019 regulation is one, it cannot leverage a patient's need for imminent care to say, now you need to sign an arbitration agreement before I give you that imminent care. And the second thing that a nursing home cannot do is it cannot inhibit CMS regulations. And that's N5 and N6 of the 2019 regulation. I wanted to address this point about, in a little bit more detail too, about singling out arbitration agreements. Like I said, there's no sort of textual basis other than the sort of arbitration agreements, and something has to single out as to those concepts. And in fact, we know that to be the case, because if it were that any rule that specifies arbitration is invalid, then a host of Supreme Court decisions would be incorrect. Those include, for example, Volt, where there was a California rule that specified the order of arbitral proceedings and judicial proceedings and imposed different rules for those. That would include Shearson v. McMahon, where the Supreme Court blessed SEC rules to protect statutory rights in the face of arbitration. All of those cases would simply be incorrect under plaintiff's theory because all of them specify arbitration. And in fact, what's really quite anomalous about their theory is even basic requirements, such as having nursing homes keep paperwork for five years, keep arbitral paperwork for five years, would be something that you couldn't do because that would somehow single out a nursing home's arbitral practices. So in that sense, we know that the only thing that the FAA does in fact prohibit is things that go to the validity, irrevocability, and enforceability of arbitration agreements. And there are certainly provisions in here that don't even come close to that line. And the other provisions here, they simply let nursing homes continue to go about, continue to enter into arbitration, and continue to receive their Medicare and Medicaid funding. Council, let me ask you a similar inquiry to the government, in terms of what impact this rule will have on the availability of facilities that are impacted by the change. I want to answer this in two ways. Insofar as your honor is concerned about what the potential economic impact and what the potential reliance interest about informing patients about their choice that they can enter into arbitration is, the government in the context of the 2016 regulation, they said, look, this entire comprehensive scheme of reforming nursing home reform regulations doesn't have a substantial economic impact and there's a very extensive economic analysis there. The 2019 regulation rolls back some of those regulatory requirements, necessarily has even less of an economic impact. And I just really can't see one where if you follow this rule, the only things you need to do is you have to tell a patient that, you know, here's an arbitration agreement. You can sign onto it if you want to, just like any other business in the world, when they give an arbitration agreement to somebody, they tell them, you know, here's an agreement and you can sign onto it. That's not somehow an onerous business impact. The other point I do want to make on that score is, you know, to the extent your honor is sort of concerned about whether or not there's kind of specific benefits and specific downsides to health and safety that are sort of measurable and empirical. HHS solicited views from a broad spectrum of organizations. I mean, there's organizations that are, you would characterize as pro-arbitration, like the American Arbitration Association or the American Bar Association. There are organizations that are there to oversee nursing homes, like state ombuds persons who are charged with that responsibility under the statute. And none of them want to have anything to do with this type of practice that the plaintiffs are proposing here. And that's for a very good reason. Your honor, you pointed out, like, issues with contracts of adhesion. You know, we don't, HHS hasn't come out and said all of these are contracts of adhesion, and that would be a state by state determination of whether under state law something is a contract of adhesion or not. But that's the basic dynamic that HHS was trying to prevent, where, you know, you might have your mom come out of surgery. She might, you know, she might not be sick enough for a hospital bed and an inpatient bed, but she might still need 24-7 care, and she might not have options. You go into the nearest nursing home, her family comes, and you say, mom, like, what are these papers that you signed? Like, you know, and she's like, oh, I don't know. Like, you know, I needed to get care, and like, here I am. That's the basic problem that HHS is trying to resolve, and that's a policy judgment of whether patients should be in that type of situation at all. That's fundamentally something where HHS wants to be more protective of patients' rights, patients' health, patients' safety, and those are all- Why in particular did HHS single out the arbitration provision in the facilities contracts as opposed to other specific kinds of provisions within those agreements? What's the focus on arbitration? Yeah, so that's a great question, and I want to focus on one thing that the other side said, which is really just inaccurate, that HHS doesn't govern these type of contracts at all. When you enter a nursing home, you might have an admissions contract, and you might have another, you know, arbitration contract. HHS governs these things all the time. There's, are, you know, there's regulations against putting, you know, requiring donations in contractual clauses. There's regulations against waiving property loss or waiving your statutory right as part of those contractual clauses. That happens all the time. HHS, if you look in 42 CFR 483.15, there's a list of those, and HHS requires notice of certain types of rights under the statute, and that's in 42 USC 1395I-3, sorry this is long, subsection C1b. HHS requires those sorts of notice and those sorts of contractual provisions across the board. I mean, HHS reached this particular issue regarding arbitration because numerous commentators, again from a broad spectrum of organizations, said, look, there is a problem going on today, and HHS doesn't go out there and kind of invent problems that aren't happening in the world. Commenters come to the agency. They say, look, we know this is happening. We know there are mandatory arbitration agreements happening where individuals come into nursing homes where they don't have a choice about whether they really are in that only nursing home in a geographic area, and all of a sudden you're given a choice whether to accept health care or whether to sign an arbitration agreement, and HHS said that's just not a choice you should put one of our patients into, especially if you're going to accept Medicare and Medicaid funding. So in that sense, that's why HHS focused on this issue. It's not because, you know, somebody in a back room thought arbitration is a terrible thing. It's numerous people came to HHS and said this is actually a real-world problem that needs some type of fix, and HHS's fix here, just to be clear, is, I think, a really reasonable one, which is you can go ahead. You can use arbitration. You can explain to nursing home patients all the great benefits of arbitration. Those patients can sign on voluntarily to arbitration, and at the end of day, you can have those agreements enforced in court, but the only thing you can't do is two things, which are, you know, during that crucial admissions process, you can't just kind of say you can't be part of our nursing home. You can't get any sort of care now because you're not willing to sign this arbitration agreement, and the second thing you can't do is you can't inhibit CMS inspections, which, by the way, you know, I know plaintiff's reply brief on page 21 notes that they're not challenging that. They have challenged subsection N6 throughout the course of this litigation and even the district courts. Are there aspects of the rule that are severable? You know, we do think the entire rule is valid. You know, as we kind of put it, there are two buckets of, you know, regulatory provisions. The district court found all of them to be completely valid, and, of course, if this court doesn't agree with that proposition, I think the proper thing to do is to remand for the district court to kind of parse out which of these operate together, which of these can be pulled apart from one another, but I will say there are kind of the two buckets, which is one is to decouple from the admissions process the signing of arbitration agreements, and the second is to not inhibit CMS inspections. The last kind of piece I really do want to talk about is there's a suggestion that once what happens in the case of a violation of the HHS rule, and at this point the district court was exactly right. Even if, let's say, you don't want to follow this HHS rule, let's say you want to just go ahead and violate it, your arbitration agreements are still valid. They're still enforceable. There's a suggestion that opposing counsel made about whether or not HHS would go in with a plan of correction and require nursing homes to kind of invalidate on a case-by-case basis individual arbitration agreements. There's no support in that in any document, like within CMS's possession. There's no support in that in this record that CMS would require nursing homes to invalidate specific arbitration agreements, and I actually think that's a really helpful example from our perspective, and, you know, just to explain why, in their reply brief they cite to this case called Murphy Oil, which went up with Epic System, and in Murphy Oil you had a case where the NLRB was requiring employers to invalidate and to rescind individual arbitration agreements. That's not what's happening here. Nursing homes can continue to have their arbitration agreements, and even if they violate this rule, the secretary has said repeatedly, those arbitration agreements are still valid and enforceable. What's not happening here is CMS going in, having nursing homes invalidate specific arbitration agreements. But counsel, won't the consequence of continuing their current practice would be to forfeit future receipt of Medicaid and Medicare funding? So, what usually happens in this circumstance is, you know, I would say that nursing homes that violate one regulatory provision, that's often not the only one that they're violating, but, you know, what happens is CMS goes in and they kind of do an inspection, and they look and they say, you know, what are the different types of things that you're following, not following. They have nursing homes submit a plan about what they're going to do in order to be better going forward. If they continue to violate that plan, and they continue to cause damage to health and to safety, there can be consequences to Medicare and Medicaid funding on the back end. Are you saying that facilities that continue to have provisions that the rule restricts might not lose their Medicaid funding on that basis alone? Yeah, I think it would have to be really a case-by-case assessment, and these things often are. You know, you give notice to a nursing home. So, you're saying some facilities would survive the restriction of funds, and others would continue to receive it, and both could still have these provisions? Yeah, I would hate to predict any given case, but let me just give you one example, which is take, for instance, a nursing home said, I want to keep my arbitration paperwork around for four years and not five years. You know, maybe it's a violation of the regulation. Is HHS going to cancel all Medicare funding on that basis? In fact, HHS needs to find an immediate harm to health and safety before it sort of terminates somebody from the Medicare program. Is it going to have some sort of penalty? Like, maybe it would, maybe it wouldn't, but there's a whole broad spectrum of types of violations you might have in this type of circumstance, and I'd really just hate to predict what those are, but I do think it latches on to a key point, which is that still isn't invalidating, revoking, or not enforcing a particular arbitration. Let's say the nursing home, you know, for example, forgot to tell one patient that they couldn't sign, they could choose not to sign an arbitration agreement. That doesn't automatically revoke or cause the non-enforcement of your arbitration agreement. In fact, courts are bound to enforce those arbitration agreements, presuming that they comply with state law. But it could put their Medicaid funding in jeopardy, though. Yeah, there could be. I mean, I agree with that, and I don't want to, you know, diminish that at all. There could be consequences for Medicare and Medicaid funding. I really don't, you know, mean to diminish that, but there could be consequences. But that's not to say that, you know, their prediction is nursing homes can't do any arbitration or nursing homes lose all of their Medicare and Medicaid funding. I don't think it's that black and white at all, and it's not that black and white for any other regulatory provision that CMS kind of has together. So the last, you know, point I do want to make is, you know, there are ways to read CMS's rule and the Federal Arbitration Act completely consistently. The Supreme Court has said the mode of analysis here, and this is in EPIC systems where they said we actually don't find a conflict, and we've never found a conflict between two federal authorities or between a federal authority and the Federal Arbitration Act. The mode of analysis here is that we try to avoid those sorts of conflicts at all costs. And in here, CMS's rule says you can have arbitration agreements, you can go about your business, and also you can have Medicare and Medicaid funding. I mean, those are completely consistent propositions. It's a completely consistent proposition to then enforce and have a valid arbitration agreement on the back end under CMS's rule, or even if you don't want to go and follow CMS's rule. And in that sense, there really just is no conflict here. And the sort of clear statement principle that the other side mentions, if you read EPIC systems, the clear statement principle comes when you have a conflict between federal authorities. The relevant principle here is just, I think, as the first paragraph of Plaintiff's Reply Brief puts it, this is about a conflict with the FAA's pro-arbitration policy. And on that point, you just have to look at the Supreme Court statement in Waffle House, which is the pro-arbitration policy of the FAA does not require a federal agency to relinquish its statutory authority. And this would be a massive expansion of what it means to be unlawful under the Federal Arbitration Act. And it would go somewhere where the Supreme Court really has never gone in finding that another federal authority was involved because of the Federal Arbitration Act. My time is expiring. And unless there are further questions, I urge this court to affirm. Thank you, Mr. Fan. Ms. Murphy, your pick up where counsel left off. The Supreme Court has quite clearly concluded that agencies can't have rules or policies that conflict with the FAA. That was the holding of EPIC systems. The NLRB there said that it should have Chevron deference to interpret its statutory mandate under the NLRA to allow it to impose different rules in the context of labor relations because the NLRB has a broad mandate in the context of labor relations. The way the Supreme Court resolved the professed conflict there was by saying when two statutes could be read in such a manner that one intrudes on the policy of the FAA, we resolve the conflict in favor of the FAA. Unless there's a clear statement saying the NLRB can have anti-arbitration rules or restrict arbitration, the FAA trumps. That's the same principle we're relying on here. Unless there's a clear statement in the Medicare and Medicaid statutes, CMS doesn't have the power to impose rules that restrict or condition arbitration agreements. Now, counsel says that we're positing some sort of rule that any time you address arbitration by terms, the rule is necessarily invalid. That's not the point. The principle that the Supreme Court has repeatedly articulated is when you single out arbitration for specially disfavored treatment. And the Supreme Court has invalidated provisions that are virtually identical to what we're talking about here. Provisions that say it's fine to have arbitration as long as you do X, Y, and Z when entering into arbitration agreements. The whole thrust of all of these cases, most recently kindred nursing, is that the way to determine whether agreements to arbitrate are voluntary is by applying ordinary state contract laws like the dress doctrine, the unconscionability doctrine. So the policy judgment has already been made by Congress, and Congress says unless you have a violation of generally applicable state rules about contracting law, arbitration agreements are enforceable and should be considered voluntary on the same terms as any other agreement. By trying to override that policy, CMS has gone outside of its statutory authority and created the kind of conflict with the FAA that renders this rule invalid in its entirety. Thank you, Ms. Murphy. Thank you also, Mr. Phan. We appreciate both counsel's presence in our virtual forum to provide argument in conjunction with the briefing that's been submitted in this case, and we'll take it in its entirety under advisement.